RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE _10 / 25 / 13_
          JDB

UNITED STATES DISTRICT COURT                    b

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

THOMAS EUGENE SHOEMAKE, JR.,          CIVIL ACTION
        Appellant                     NO. 2:12-CV-02743

VERSUS

COMMISSIONER OF SOCIAL SECURITY,      JUDGE JAMES T. TRIMBLE
        Appellee                      MAGISTRATE JUDGE JAMES D. KIRK

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Thomas Eugene Shoemake filed an application for disability insurance benefits ("DIB") on April 9, 2010 alleging a disability onset date of February 23, 2010 (Tr. p. 173) due to ideopathic thrombocytopenic purpura ("ITP," a platelet disorder)[1] and needing hip replacements in both hips (T. pp. 78, 204).  That application was denied by the Social Security Administration ("SSA") (Tr. p. 78).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on March 30, 2011, at which Shoemake appeared with his attorney and a vocational expert (Tr. p. 45).  A supplemental hearing was held on July 18, 2011 at which Shoemake appeared with his attorney, a vocational expert, and a medical expert (Tr. p.

---

[1] The undersigned takes judicial notice of the explanation of ITP set forth by the Mayo Clinic at http://www.mayoclinic.com/health/idiopathic-thrombocytopenic-purpura/DS00844/METHOD=print, which is cited in medlineplus.gov (a service of the U.S. National Library of Medicine and the National Institutes of Health):
     "Idiopathic ['of unknown cause'] thrombocytopenic purpura (ITP) is a disorder that can lead to easy or excessive bruising and bleeding. The bleeding results from unusually low levels of platelets — the cells that help your blood clot. ...In adults, however, the disorder is often chronic. ..."

26).  The ALJ found that Shoemake was disabled from February 23, 2010 through March 31, 2011 due to severe status post right shoulder arthroscopy and status post bilateral hip replacement due to avascular necrosis, which medically equaled the criteria of Listing 1.02A (Tr. pp. 13-14).  The ALJ further found that Shoemake's disability ended on April 1, 2011 due to medical improvement (Tr. p. 16); as of April 1, 2011, Shoemake's severe impairments no longer met or equalled a listing (Tr. p. 16).  The ALJ found that, as of April 1, 2011, Shoemake had severe impairments of severe status post right shoulder arthroscopy and status post bilateral hip replacement due to avascular necrosis, but had the residual functional capacity to perform sedentary work except that he can only occasionally reach in all directions with the dominant right upper extremity, only occasionally engage in overhead work activities with the dominant right upper extremity, cannot squat, crouch, kneel or crawl, can only occasionally stoop, and cannot work around hazards such as dangerous machinery and heights (Tr. p. 16).  The ALJ further found that, although Shoemake cannot perform his past relevant work as a construction equipment mechanic (Tr. p. 19), he can work as a telemarketer, a non-911 dispatcher, or an information clerk (Tr. p. 20) and, therefore, was not disabled, as defined in the Social Security Act, from April 1, 2011 through the date of the ALJ's decision on August 18, 2011 (Tr. pp. 20-21).

Shoemake requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's

decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Shoemake next filed this appeal for judicial review of the Commissioner's final decision.  Shoemake raises the following issues on appeal:

> 1. The ALJ erred in finding that Shoemake ceased to meet Listing 1.02(A) as of April 1, 2001.
>
> 2. The Commissioner failed to bear his burden of establishing substantial medical improvement as was necessary so support a finding that Shoemake suffered from a closed period of disability.
>
> 3. The ALJ erred in relying on his own unsupported opinions of Shoemake's physical limitations, contrary to the medical evidence, which affected Shoemake's ability to engage in work.
>
> 4. The ALJ's finding that Shoemake can return to other work and the determination of residual functional capacity are unsupported by substantial evidence.  Also, the VE's testimony is based on an improper hypothetical question which required the assumption of a residual functional capacity that is not supported by the evidence.
>
> 5. Alternatively, good cause exists for new, relevant medical evidence to be considered, since it would have possibly changed the outcome of the prior determination.

Shoemake filed a brief in support of his appeal (Doc. 10), to which the Commissioner responded (Doc. 11).  Shoemake's appeal is now before the court for disposition.

<u>Eligibility for DIB</u>

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  42 U.S.C. 416(i), 423.  Establishment of a disability is contingent upon two findings.  First, a

plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

At the time of his July 2011 supplemental administrative hearing, Shoemake was 47 years old, has a ninth grade education in special education classes and has training in welding (Tr. p. 205), and has past relevant work as a mechanic in the construction industry (1994-2010) (Tr. p. 206).

### 1.  Medical Records

In early March 2009, Shoemake was examined and found to be 44 years old, 6'2" tall, weighed 350 pounds, his blood pressure was 145/104, and he had an incisional hernia (Tr. p. 233).  He was diagnosed with morbid obesity and elevated blood pressure, and prescribed Lotensin (Tr. p. 232).  Two weeks later, Shoemake's blood pressure was 140/88; his history of ITP was noted (Tr. p. 234).  In December 2009, Shoemake's blood pressure was 130/90 (Tr. p. 235).  Shoemake's complaints of hip pain bilaterally were noted (Tr. p. 235).

In February 2010, Shoemake (now 45 years old) complained to Dr. Michael A. Traub, a family medicine doctor, of hip pain for six months and he walked with a limp; his blood pressure was 142/94

4

(Tr. p. 236).  X-rays showed subtle irregularities of the superior weight bearing surface of the left femoral head and osteoarthritis of the left hip (Tr. p. 236, 245).  MRIs of the hips were suggestive of AVN (avascular necrosis, or osteonecrosis)[2] of the anterior superior left femoral head with osteoarthritic changes, bone marrow edema and joint effusion, and of early AVN of the right femoral head (Tr. pp. 236, 242-243, 713-716).

In March 2010, Shoemake was examined by Dr. Nathan P. Cohen, an orthopaedic surgeon, Dr. Cohen found Shoemake was 6'3" tall and weighed 380 pounds (Tr. p. 262).  X-rays were positive for a

---

[2] The undersigned takes judicial notice of the definition of osteonecrosis provided in medlineplus.gov (a service of the U.S. National Library of Medicine and the National Institutes of Health).  See http://www.nlm.nih.gov/medlineplus/osteonecrosis.html:
"Osteonecrosis is a disease caused by reduced blood flow to bones in the joints. In people with healthy bones, new bone is always replacing old bone. In osteonecrosis, the lack of blood causes the bone to break down faster than the body can make enough new bone. The bone starts to die and may break down.
"You can have osteonecrosis in one or several bones. It is most common in the upper leg. Other common sites are your upper arm and your knees, shoulders and ankles. The disease can affect men and women of any age, but it usually strikes in your thirties, forties or fifties.
"At first, you might not have any symptoms. As the disease gets worse, you will probably have joint pain that becomes more severe. You may not be able to bend or move the affected joint very well.
"No one is sure what causes the disease. Risk factors include
　　Long-term steroid treatment
　　Alcohol abuse
　　Joint injuries
　　Having certain diseases, including arthritis and
　　cancer
"Doctors use imaging tests and other tests to diagnose osteonecrosis. Treatments include medicines, using crutches, limiting activities that put weight on the affected joints, electrical stimulation and surgery."

significant bony abnormality in Shoemake's left hip and Dr. Cohen diagnosed osteoarthritis in the left hip with AVN in the left femoral head (Tr. pp. 262-264). Dr. Cohen recommended conservative treatment through a hip injection (Tr. p. 263). In April 2010, Dr. Cohen noted that Shoemake had a steroid injection in March 2010 which was difficult to administer and did not help (Tr. pp. 254-261), and that he had avascular necrosis on his left femoral head (per MRI) (Tr. p. 247). Dr. Cohen also wrote that Cohen had lost his job but had insurance through about June (Tr. p. 247). Dr. Cohen recommended left total hip joint arthroplasty surgery (Tr. pp. 248-249), which Shoemake underwent in April 2010 (Tr. pp. 283-308, 590-591). In May 2010, it was noted that Shoemake was recovering extremely well from his left total hip joint arthroplasty (Tr. p. 319).

In August 2010, Shoemake complained of right hip pain, and stated that his left hip discomfort is initiated with the first steps but then resolves, and becomes symptomatic again toward the end of the day (Tr. p. 689). However, Shoemake's right hip was symptomatic throughout the day (Tr. p. 689). A CAT scan showed progressive avascular necrotic changes in the right femoral head (Tr. p. 704). Dr. Cohen diagnosed avascular necrosis of the right femoral head and osteoarthritis of the right acetabulum and recommended a right total hip joint arthroplasty (Tr. pp. 755-756).

In early November 2010, Shoemake underwent a right total hip joint arthroplasty (Tr. pp. 357, 390-391, 448-450, 687). In mid-November 2010, Dr. Cohen found Shoemake was recovering well from

6

his surgery, but expressed concern about Shoemake's relative youth (46) and size (Tr. p. 681).  In January 2011, x-rays of Shoemake's bilateral hips showed no complications regarding arthroplasty components, alignment, polyethylene space, or bone stock, and the soft tissue was within normal limits (Tr. p. 792).

Also, in January 2011, Shoemake was examined for complaints of pain in his right shoulder for three months (Tr. pp. 791-803).  An MRI revealed a rotator cuff tear, bursitis, and extensive degeneration (Tr. p. 876).  Dr. Brett Cascio, an orthopedic surgeon and sports medicine doctor, diagnosed right shoulder rotator cuff tear, adhesive capsulitis, and right proximal biceps tendonitis, and recommended a shoulder arthroscopy (Tr. pp. 804-805).  A nerve conduction study in February 2011 showed chronic incomplete right ulnar neuropathy at the elbow, and mild-moderate right carpal tunnel syndrome (Tr. pp. 806-807).  Dr. Cascio performed a right shoulder arthroscopy, subacromial decompression, rotator cuff repair, and biceps tenodesis in February 2011 (Tr. pp. 821-82). Shoemake underwent physical therapy for his shoulder in March and April 2011 (Tr. pp. 833-834).

In June 2011, Shoemake again complained of pain in his right shoulder; x-rays showed mild AC joint degenerative changes and mild to moderate glenohumeral arthritis (Tr. pp. 886, 889).  Dr. Geoffrey J. Collins, an orthopedic surgeon and sports medicine doctor, found no evidence of failure of the previous subacromial decompression, but there was a significant amount of subdeltoid bursitis (Tr. p. 889).  Dr. Collins stated that Shoemake was

struggling with his prior shoulder surgery and was not capable of working with his right shoulder (Tr. p. 889).

Also in June 2011, Shoemake complained to Dr. Cohen of continued left hip pain, with groin pain, burning to mid-thigh, pain in the sciatic notch, and pain across his buttocks; Shoemake stated his right hip was doing okay (Tr. p. 897). Cobalt-chrome tests were ordered (Tr. p. 898). Dr. Cohen noted that Dr. Cascio had repaired Shoemake's rotator cuff in February 2011, and that Shoemake was off work and disabled (Tr. p. 898). Dr. Cohen also filled out a form for Shoemake's "physical restrictions and limitations," which stated that Shoemake can stand, walk, sit or drive for less than one hour at a time, can occasionally lift/carry up to twenty pounds, his use of a keyboard is limited by the fact that he cannot sit very long, he can never climb or crawl, he can occasionally reach above the shoulder, handle, or finger objects, and cannot be exposed to extreme cold, heat, or wet/humid conditions (Tr. p. 899).

In August 2011, Dr. Cohen wrote that Shoemake is 46 years old and has undergone bilateral total hip joint arthroplasty (Tr. p. 901). Dr. Cohen wrote that Shoemake is unable to ambulate in an efficient manner without walking aids due to his prior hip surgeries and morbid obesity (Tr. p. 901). Dr. Cohen also wrote that Shoemake is unable to sustain a reasonable walking pace over a reasonable distance to carry out activities of daily living, is unable to walk a block at a reasonable pace on rough or uneven surfaces, and is unable to use standard public transportation due

to those factors (Tr. p. 901).  Dr. Cohen also wrote that, even climbing a few steps at a reasonable pace, using a single handrail, is difficult for Shoemake (Tr. p. 901).

### 2. March 2011 Administrative Hearing

Shoemake appeared at his March 2011 administrative hearing with his attorney and a vocational expert ("VE").  Shoemake testified that he has three children, one of whom is less than 18 (Tr. p. 51).  Shoemake testified that his wife last worked in February 2011 (Tr. p. 51).

Shoemake also testified that he is not working because he had two prior hip replacements, and a torn rotator cuff which was repaired in February 2011 by Dr. Cascio (Tr. p. 51).  Shoemake testified that he was still in physical therapy for his rotator cuff (Tr. p. 52).  Shoemake testified that his left hip hurts all the time, and that he has an appointment in about three weeks with Dr. Cohen for x-rays (Tr. p. 52).  Shoemake testified that his left hip began hurting again after he had his right hip replaced, because he put more weight on his left hip while his right hip recovered (Tr. p. 53).  Shoemake testified that the pain in his left hip has gradually worsened (Tr. p. 54).  Shoemake also testified that Dr. Casio told him he has carpal tunnel syndrome in both wrists and "hammer's elbow" in both elbows (Tr. p. 55).  Shoemake testified that he has trouble with his grip and tends to drop stuff (Tr. p. 57).

Shoemake testified that he can stand for thirty minutes to an hour, sit thirty minutes to an hour, and walk about fifty yards

(Tr. p. 56).  Shoemake testified that he does not sleep well because he aches and cannot get comfortable in bed (Tr. p. 56).

Shoemake testified that he can read somewhat, but cannot read and understand a newspaper (Tr. p. 57).  Shoemake testified that the highest grade he attended in school was ninth grade and he did not earn a GED (Tr. p. 57).  Shoemake testified that he has never had a clerk job or a desk job (Tr. p. 57).  Shoemake testified that he has mostly worked as a mechanic and a heavy equipment operator (Tr. p. 57).

   3. July 2011 Supplemental Administrative Hearing

At his July hearing, Shoemake appeared with his attorney, a vocational expert ("VE"), and a medical expert ("ME") (Tr. p. 26).

Dr. Frank Barnes, an orthopedic surgeon in Texas, testified as a medical expert who had reviewed Shoemake's file (Tr. pp. 33-34).  Dr. Barnes testified that Shoemake has advanced necrosis in both hips, is obese, has a history of hypertension that is well controlled with medications, has tendonitis in his right shoulder and has a partial tear in his right rotator cuff (Tr. p. 34).  Dr. Barnes testified that Shoemake met or equaled Listing 1.02 from February 2010 through January 13, 2011 (Tr. p. 34).  Dr. Barnes further testified that, since January 13, 2011, Shoemake can do sedentary work with no reaching with his right arm due to shoulder problems, no climbing ladders, ropes or scaffolds, and no climbing stairs, no squatting, crawling or kneeling, but he can occasionally stoop, and he cannot be exposed to vibrations or moving machinery (Tr. p. 36).  Dr. Barnes testified that Shoemake can drive a truck

10

and heavy equipment unless he has to climb up to it, like a crane operator (Tr. p. 36).  Dr. Barnes testified that Shoemake does not need to alternate sitting and standing, and does not need a handheld assistive device for ambulation (Tr. pp. 36-37).  Dr. Barnes further testified that he did not have Shoemake's most recent medical records and was unaware his rotator cuff had been surgically repaired, so he would consider the opinions of Shoemake's treating orthopedic surgeons as to limitations resulting from Shoemake's hips and shoulder (Tr. pp. 37-38).

The VE testified that Shoemake's work as a mechanic on construction equipment from 1994 through 2010 was generally medium work and occasionally heavy, SVP 7, DOT 620.261-022 (Tr. pp. 39-40).  The ALJ posed a hypothetical question which involved a person of Shoemake's age, work history and education, who can do sedentary work, can occasionally reach in any direction with the right upper extremity, can occasionally do overhead work with the right upper extremity, can never squat, crouch, kneel or crawl, can occasionally stoop, and must avoid working around machinery and heights (Tr. p. 40); the ALJ did not specify any limitations with respect to skills (Tr. p. 40).  In response to that hypothetical, the VE testified that such a person can work as a telemarketer (DOT 299.357-014, SVP 3, 3527 jobs in Louisiana and 349,568 jobs nationally), a dispatcher (non-emergency) (DOT 239.367-014, sedentary, SVP 3, 1354 jobs in Louisiana, 67,601 jobs in the nation, or a sedentary information clerk (DOT 237.367-046, SVP 2, 1226 jobs in Louisiana, 84,999 jobs in the nation (Tr. pp. 40-41).

11

Shoemake testified that he had filed a lawsuit recently concerning a recall on the hip devices that were implanted in him (Tr. p. 42).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Shoemake (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).  To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

If the claimant is found to be disabled, the ALJ must also

determine if the disability continues through the date of the decision. In order to find that the claimant's disability does not continue through the date of the decision, the ALJ must show that medical improvement has occurred which is related to the claimant's ability to work, or that an exception applies. 20 C.F.R. § 404.1594(a). If there is a medical improvement related to the ability to work, the ALJ just also show the claimant is able to engage in substantial gainful activity, using an additional eight-step evaluation process, 20 C.F.R. § 1594(f):

> (1) Is the claimant engaged in substantial gainful activity? (If so, the disability has ended.)
> (2) If not, does the claimant have an impairment of combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? (If so, the disability is continuing.)
> (3) If not, has there been medical improvement?
> (4) If there has been medical improvement, is it related to the claimant's ability to do work?
> (5) If there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable? (If not, the disability is continuing.)
> (6) If there has been medical improvement related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended.)
> (7) If so, is the claimant able to engage in past relevant work? (If so, the disability has ended.)
> (8) If not, is the claimant able to perform other substantial gainful activity?

Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled. Waters v. Barnart, 276 F.3d 716 (5th Cir. 2002). The burden rests on the government to show that the claimant's disability has ended as of the cessation date. Joseph v. Astrue, 231 Fed.Appx. 327 (5th Cir. 2007), cert. den., 552 U.S. 1111, 128 S.Ct. 900 (2008).

In the case at bar, the ALJ found that Shoemake has not engaged in substantial gainful activity since February 23, 2010 (Tr. p. 13), and that he has severe impairments status post-right shoulder arthroscopy and status post-bilateral hip replacement due to avascular necrosis, that his status post-bilateral hip replacement due to avascular necrosis medically equaled Listing 1.02(A) from February 23, 2010 through March 31, 2011 (Tr. p. 14), and that, since April 1, 2011, he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 13-15).  The ALJ also found that medical improvement occurred as of April 1, 2011 that is related to the ability to work (Tr. p. 16).  The ALJ further found that Shoemake is unable to perform his past relevant work as a construction equipment mechanic (Tr. p. 19).

The ALJ next found that Shoemake has the residual functional capacity to perform the full range of sedentary work except he can only occasionally reach in all directions with the dominant right upper extremity, can only occasionally engage in overhead work activities with the dominant right upper extremity, cannot squat, crouch, kneel, or crawl, can only occasionally stoop, and cannot work around dangerous machinery or heights (Tr. p. 16).  The ALJ found that the claimant is a younger individual with a limited education and that, beginning April 1, 2011, transferability of work skills is not material to the determination of disability (Tr. p. 20).  The ALJ concluded that, beginning April 1, 2011, there are a significant number of jobs in the national economy which Shoemake

14

can perform, such as telemarketer, non-911 dispatcher, or information clerk, and, therefore, Shoemake was not under a "disability" as defined in the Social Security Act at any time from April 1, 2011 through the date of the ALJ's decision on August 18, 2011 (Tr. p. 21).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).

The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981). Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 5-New Evidence</u>

Shoemake contends that good cause exists for new, relevant medical evidence to be considered, since it could have possibly changed the outcome of the prior determination.

The new medical evidence presented with Shoemake's brief (Doc. 10) shows that Shoemake underwent a right total shoulder arthroplasty on January 3, 2012. Both the pre- and post-operative diagnoses were right shoulder end-stage osteoarthritis (Doc. 10, Ex. A). In April 2013, Dr. Collins noted Shoemake's continued complaints of right shoulder weakness; there was tenderness in the greater tuberosity, a limited range of motion that was painful, positive Type I and II impingement signs, and weakness to Jobes's testing (Doc. 10, Ex. B). Dr. Collins stated that Shoemake continued to have trouble with active motion and he had neck pain;

cervical x-rays were ordered.  However, Shoemake refused a steroid injection because he was about to undergo bilateral hip revisions (Doc. 10, Ex. B).  Dr. Collins stated that Shoemake most likely would not regain active motion above shoulder level and had reached maximum medical improvement for his shoulder (Doc. 10, Ex. B).

In order to justify a remand, new evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence into the record in a prior proceeding. Bradley v. Bowen, 809 F.2d 1054, 1058 (5th Cir. 1987).  A remand to the Commissioner is not justified if there is no reasonable possibility that it would have changed the outcome of the Commissioner determination.

Evidence is "new" if it is not cumulative and adds to the evidence already existing in the case.  Bradley, 809 F.2d at 1058. "Materiality" is composed of two strands, relevance and probativeness.  Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981).  To be relevant, the new evidence must relate to the time period for which benefits were denied and cannot concern evidence of a later acquired disability or subsequent deterioration of a previously non-disabling condition.  Bradley, 809 F.2d at 1058; Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985).

Shoemake's new evidence concerns medical evaluations performed after the date of the ALJ's decision, is relevant to and probative of the Shoemake's residual functional capacity between April 1, 2011 and August 18, 2011, and conflicts with the ALJ's findings as to Shoemake's residual functional capacity after April 1, 2011.

17

Therefore, Shoemake's evidence meets the requirements to justify a remand.

<u>Issues one&2-Listing 1.02(A) and Substantial Medical Improvement</u>

Shoemake also contends that substantial evidence does not support the ALJ's finding that he no longer met Listing 1.02(A) on April 1, 2011.  Shoemake contends the Commissioner failed to bear his burden of establishing substantial medical improvement as required to support his finding that Shoemake suffered from a closed period of disability.

Listing 1.02(A) states:

"1.02 *Major dysfunctions of joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints(s). With:
"A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; ... ."

Listing 1.00(B)(2)(b) explains what is meant by "inability to ambulate effectively." Listing 1.00(b)(2) states that, to ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living, and must have the ability to travel without companion assistance to and from a place of employment or school.  As examples of the inability to ambulate effectively, Listing 1.00(B)(2)(b)(2) lists the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use

standard public transportation, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Finally, Listing 1.00Q requires the ALJ to consider a claimant's obesity:

> "Q. Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity."

The ALJ failed to consider the effects of Shoemake's obesity on his status post bilateral hip total arthroplasty. The ALJ briefly mentioned Shoemake's obesity in his decision (Tr. p. 16), as follows: "Regarding obesity, as per SSR 02-1p, the undersigned considered it in terms of its effect on the claimant's severe impairments; however, no medical source appreciated or articulated any restrictions or limitations relative to obesity."

Contrary to the ALJ's finding, Dr. Cohen, Shoemake's treating orthopedic surgeon for his hips, tied specific physical limitations and restrictions to the combined effects of Shoemake's hip problems and obesity. In mid-November 2010, Dr. Cohen found Shoemake was recovering well from his right hip surgery, but expressed concern for the future due to Shoemake's relative youth (46 years old) and size (6'3", 380 pounds) (Tr. p. 681). In June 2011, Dr. Cohen

filled out a form for Shoemake's physical restrictions and limitations which states that Shoemake can stand, walk, sit or drive for less than one hour at a time, can occasionally lift/carry up to twenty pounds, his use of a keyboard is limited by the fact that he cannot sit very long, he can never climb or crawl, he can occasionally reach above the shoulder, handle, or finger, and cannot be exposed to extreme cold, heat, or wet/humid conditions (Tr. p. 899). In August 2011, Dr. Cohen wrote that Shoemake is 46 years old, has undergone bilateral total hip joint arthroplasty, and is unable to ambulate in an efficient manner without walking aids due to his prior hip surgeries and morbid obesity, is unable to sustain a reasonable walking pace over a reasonable distance to carry out activities of daily living, is unable to walk a block at a reasonable pace on rough or uneven surfaces, is unable to use standard public transportation due to those factors, and even climbing a few steps at a reasonable pace, using a single handrail, is difficult for Shoemake (Tr. p. 901). Therefore, Dr. Cohen clearly explained how Shoemake's obesity, in combination with his status post-bilateral hip replacements, caused functional limitations.

The ALJ erred as a factual matter in stating that none of Shoemake's doctors "appreciated or articulated any restrictions or limitations relative to obesity." The ALJ erred as a matter of law in failing to find that Shoemake's morbid obesity is a severe impairment and/or in failing to discuss whether and how Shoemake's obesity, in combination with other impairments, meets or equals one

of the listed impairments.  See SSR 02-1p; 20 C.F.R. § 404.1520(c).
Since the ALJ did not consider the effect of Shoemake's obesity on
his other impairments and his residual functional capacity,
substantial evidence does not support the ALJ's findings as to
Shoemake's residual functional capacity.

Shoemake also argues the ALJ erred in finding he no longer
meets Listing 1.02(A), and in concluding that Shoemake can
"ambulate effectively" based on a non examining physician's (Dr.
Barnes') opinion; Dr. Barnes stated that Shoemake *should* no longer
need assistance to ambulate due to his hip replacements.  However,
Dr. Cohen, the treating physician, stated that Shoemake is unable
to ambulate effectively due to the combination of his size and his
previous bilateral hip arthroplasty.   The treating physician's
opinion is entitled to more weight than that of a consulting
physician who has never examined the applicant, or when the
consulting physician examined the applicant only on a "one-shot"
basis.  Bowman v. Heckler, 706 F.2d 564, 568 (5th Cir. 1984), citing
Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981), and cases
cited therein; Warncke v. Harris, 619 F.2d 412, 416 (5th Cir.
1980); Strickland v. Harris, 615 F.2d 1103, 1109-1110 (5th Cir.
1980); Williams v. Finch, 440 F.2d 613, 616-17 & n. 6 (5th Cir.
1971).

However, the ALJ rejected Dr. Cohen's opinion and adopted Dr.
Barnes, stating (Tr. p. 18) that "Dr. Cohen found only subjective
findings on examination and performed no updated diagnostic
studies.  Dr. Cohen had not seen the claimant since January 13,

21

2011, when the examination was completely normal, and x-rays of both hips showed no complications, with normal components, alignment, polyethylene space, bone stock, and soft tissue status. Therefore, the medical evidence did not support the claimant's allegations of left hip pain on June 16, 2011, or Dr. Cohen's opinion of disability."

Since Dr. Cohen is Shoemake's treating doctor, and his findings are supported by diagnostic evidence, the ALJ erred in adopting the opinion of a non-examining consultant over Dr. Cohen's opinion. Moreover, new medical evidence submitted by Shoemake with his brief (Doc. 10) indicates that Shoemake was scheduled to undergo bilateral hip revisions in 2013. That evidence tends to support Dr. Cohen's opinion that Shoemake was unable to ambulate effectively.

Because the ALJ failed to consider Shoemake's obesity and there is new evidence as to Shoemake's hip impairments, the ALJ's finding that Shoemake no longer met Listing 1.02(A) on April 1, 2011 is not supported by substantial evidence and his decision is incorrect as a matter of law. However, this does not entitle Shoemake to a decision in his favor based upon the existing record. The record is simply inconclusive as to whether Shoemake met Listing 1.02(A) after April 1, 2011.

Therefore, Shoemake's case should be remanded to the SSA for further consideration. Shoemake's new evidence, of bilateral hip revision, can be considered by the ALJ on remand.

Issues 3-4-Residual Functional Capacity

22

Shoemake contends the ALJ erred in relying on his own unsupported opinions of Shoemake's physical limitations which were contrary to the medical evidence, affected his ability to engage in work, and are unsupported by substantial evidence.  Shoemake also contends the VE's testimony is based on an improper hypothetical question which required the assumption of a residual functional capacity that is not supported by the evidence.  Shoemake complains specifically that the ALJ erred in concluding he can sit up to six hours in an eight hour day (sedentary work), and can occasionally reach and work above the shoulder or overhead with his dominant right arm.

In June 2011, Dr. Cohen, Shoemake's treating orthopedic surgeon for his hips, stated that Shoemake can walk or stand for less than one hour at a time.[3]  However, the ALJ found Shoemake can do sedentary work, which requires the ability to sit for up to six hours in an eight hour day.  As discussed above, the ALJ erred in giving "little weight" to Dr. Cohen's assessment of Shoemake's complaints of hip pain and ability to sit, walk and stand.

Dr. Collins, Shoemake's treating orthopedic surgeon for his right shoulder, found that Shoemake has a significant amount of subdeltoid bursitis in his right shoulder, was struggling with his prior shoulder surgery, and was not able to work with his right shoulder (Tr. p. 889).  Likewise, the medical consultant, Dr.

---

[3] Dr. Cohen also stated that Shoemake can occasionally reach above the shoulder and work overhead with his right arm, and can sit.  However, Dr. Cohen is not Shoemake's treating orthopedic surgeon for his shoulder.

Barnes, also included a functional limitation for reaching with the right arm due to shoulder problems (Tr. p. 35).  However, the ALJ stated that he gave Dr. Collins' opinion little weight because "no evidence existed that the right shoulder resulted in total disability" (Tr. p. 19).  The ALJ is correct; Shoemake's right shoulder problems did not necessarily result in a "total disability."  However, no medical evidence supports the ALJ's finding that Shoemake can engage in occasional reaching in all directions and overhead work with his right arm.[4]

It is clear, from the objective and subjective medical evidence and the opinion of Shoemake's treating orthopedic surgeon, that Shoemake could not use his right shoulder for work.  The ALJ clearly erred in failing to include that limitation in Shoemake's residual functional capacity and in the hypothetical to the VE.

The ALJ's errors with regard to Shoemake's residual functional capacity are highlighted by the new medical evidence presented with Shoemake's brief (Doc. 10), which shows that Shoemake underwent a right total shoulder arthroplasty on January 3, 2012.  The pre- and post-operative diagnoses were right shoulder end-stage osteoarthritis (Doc. 10, Ex. A).  In April 2013, Dr. Collins noted Shoemake's continued complaints of right shoulder weakness, pain and tenderness, a limited range of motion, and impingement signs

---

[4] An ALJ does not have the medical expertise to substitute his opinion as to the nature of a claimant's medical complaints for the supported and unrefuted diagnosis of the treating physician.  See Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2002); Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990), cert. den., 502 U.S. 901, 112 S.Ct. 278 (1991).

(Doc. 10, Ex. B).  Dr. Collins stated that Shoemake most likely would not regain active motion above shoulder level and had reached maximum medical improvement for his shoulder (Doc. 10, Ex. B).  The new medical evidence of right total shoulder arthroplasty and bilateral hip revisions must be considered by the ALJ on remand.

Finally, it is noted by the undersigned that the ALJ failed to consider Shoemake's mental impairment, despite the fact that there was evidence that Shoemake only went as far as the ninth grade in school and was in special education classes.  Shoemake testified that he cannot read and comprehend a newspaper.  This limitation was not included in the hypothetical to the VE, even though it was raised by the evidence of record.  That evidence tends to negate the possibility that Shoemake can work as an information clerk, a non-emergency dispatcher, or a telemarketer.[5]  Therefore, on remand, the ALJ should evaluate and determine Shoemake's residual functional capacity and include any mental imitations in the hypothetical to the VE.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Shoemake's appeal be GRANTED, the final decision of the

---

[5] The jobs of "information clerk," DOT 239.367-014, dispatcher, DOT 239.367-014, and telemarketer, DOT 299.357-014, all require Language Level 3-the ability to "[r]ead a variety of novels, magazines, atlases, and encylopedias.  Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work."  It seems clear that Shoemake does not meet this level of reading.

Commissioner be VACATED, and the case be REMANDED to the ALJ for a determination of Shoemake's correct residual functional capacity both before and after his most recent shoulder and hip operations, and to determine whether there are any jobs which Shoemake can perform given his true impairments.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this day of October 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE